UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NOREEN RAHNI, | 3:18-CV-00754 (KAD) |
| *Plaintiff*, | |
| v. | |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY,[1] | November 14, 2019 |
| *Defendant*. | |

**MEMORANDUM OF DECISION RE:
PLAINTIFF'S MOTION TO REVERSE OR IN THE ALTERNATIVE
TO REMAND THE DECISION OF THE COMMISSIONER (ECF NO. 21) AND
DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE
COMMISSIONER (ECF NO. 35)**

Kari A. Dooley, United States District Judge:

Noreen Rahni (the "Plaintiff") brings this administrative appeal pursuant to 42 U.S.C. § 405(g). She appeals the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and supplemental security income benefits ("SSI") pursuant to Title XVI of the Act. Plaintiff moves to reverse the Commissioner's decision or, in the alternative, to remand the case to the agency based on the alleged failure of the Administrative Law Judge ("ALJ") to: (1) identify all of Plaintiff's medically determinable impairments; (2) confer proper weight on the opinions of two of Plaintiff's treating

---

[1] Plaintiff commenced this action against Nancy A. Berryhill as the Acting Commissioner of Social Security on May 4, 2018. (ECF No. 1.) Andrew M. Saul became the Commissioner of Social Security on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Commissioner Saul is automatically substituted for Nancy A. Berryhill as the named defendant. The Clerk of the Court is requested to amend the caption in this case accordingly.

physicians; and (3) determine properly Plaintiff's Residual Functional Capacity. The Commissioner opposes each of these claims of error and moves for judgment on the pleadings affirming its decision. For the reasons set forth below, Plaintiff's Motion to Reverse is DENIED and the Commissioner's Motion to Affirm is GRANTED.

**Standard of Review**

A person is "disabled" under the Act if that person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(a); 1382c(a)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3); 1382c(a)(3)(D). In addition, a claimant must establish that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* §§ 423(d)(2)(A); 1382c(a)(3)(B).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months;" (3) if such a severe

impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform her past relevant work; (5) if the claimant is unable to perform her past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of her RFC and her education, age, and work experience. *Id.* §§ 404.1520 (a)(4)(i)-(v); 404.1509. The claimant bears the burden of proof with respect to Step One through Step Four, while the Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).

It is well-settled that a district court will reverse the decision of the Commissioner only when it is based upon legal error or when it is not supported by substantial evidence in the record. *See, e.g., Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotations marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596

F. Supp. 2d 446, 448 (D. Conn. 2009). The court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (*per curiam*) (quotation marks and citation omitted). Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian,* 708 F.3d at 417.

**Procedural History**

On March 28, 2015 and September 17, 2015, Plaintiff filed applications for DIB and SSI, respectively, pursuant to Title II and Title XVI of the Act, alleging an onset date of February 7, 2012. The claims were initially denied on June 10, 2015 and upon reconsideration on September 24, 2015. Thereafter, a hearing was held before an ALJ on January 25, 2017. On March 22, 2017, the ALJ issued a written decision denying Plaintiff's applications.

In her decision, the ALJ followed the sequential evaluation process for assessing disability claims. At Step One, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since the alleged onset date of February 7, 2012. (Tr. 78.) At Step Two, the ALJ determined that Plaintiff had severe impairments consisting of chronic obstructive pulmonary disorder ("COPD") and major depressive disorder and a non-severe medically determinable impairment consisting of migraines. (Tr. 78.) At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination thereof that meets or medically equals the severity of a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (Tr. 79–80.) At Step Four, the ALJ concluded that Plaintiff has the RFC to perform a full range of work at all exertional levels, subject to certain non-exertional limitations. (Tr. 81.) The ALJ further found that Plaintiff does not have have the RFC to perform her past relevant work as a barista/counter attendant, machine

4

packager, or counter clerk. (Tr. 87–88.) Finally, at Step Five, the ALJ concluded that there are a significant number of jobs in the national economy that Plaintiff could perform, such as a price marker, collator operator, or mail clerk. (Tr. 88–89.) Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Act.

On March 14, 2018, the Appeals Council denied Plaintiff's request for review, thereby rendering final the ALJ's decision. (Tr. 5.) This appeal followed.

**Discussion**

Plaintiff sets forth three bases upon which the Commissioner's decision should be reversed. She first asserts that the ALJ incorrectly determined that Plaintiff's carpel tunnel syndrome and sciatica are not medically determinable impairments. She next asserts that the ALJ violated the "treating physician rule" by assigning insufficient weight to the opinions of Plaintiff's treating physicians Drs. Enenge A'Bodjedi and Kirsten Hohmann. Lastly, Plaintiff submits that the ALJ incorrectly formulated Plaintiff's RFC. She claims that she should have been limited to light exertion work and to work involving no public interaction. These issues are addressed *seriatim*.

> **Whether Substantial Evidence Supports the ALJ's Determination that Plaintiff's Carpel Tunnel Syndrome and Sciatica Are Not Medically Determinable Impairments**

Pursuant to the regulations established by the Commissioner, "a medically determinable physical or mental impairment . . . must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. The impairment must therefore "be established by objective medical evidence from an acceptable medical source," not the claimant's own "statement of symptoms" or "a diagnosis or medical opinion." *Id.* § 404.1521. Citing substantially these same

5

standards,[2] the ALJ found that Plaintiff's "back pain and carpal tunnel syndrome are not medically determinable impairments due to a lack of objective evidence." (Tr. 78.) Plaintiff asserts that this finding is error.

### *Carpel Tunnel Syndrome*

The ALJ observed that treatment notes from Dr. John Dowdle reflect that he suspected Plaintiff had carpal tunnel syndrome and that she received a wrist splint in June 2015. (Tr. 79.) He therefore ordered an electromyography ("EMG") "for further evaluation" of the issue. (Tr. 563.) Because the subsequent electrodiagnostic report that embodied this EMG testing "showed no electrophysiologic evidence of radiculopathy, myopathy, or distal compressive neuropathy," the ALJ concluded that the "suspicion" of carpal tunnel syndrome was not confirmed. (Tr. 79.) And absent any other objective medical evidence in the record to support the diagnosis, the ALJ concluded that the alleged impairment of carpal tunnel syndrome was not medically determinable. (Tr. 78–79.)

Plaintiff asserts that electrodiagnostic testing is prone to producing false negative results and is not necessary to diagnosing carpal tunnel syndrome. She claims that she has been diagnosed with carpal tunnel and cites the portion of the 2015 electrodiagnostic report that "revealed increased latency and decreased velocity" in "the right median anti-sensory nerve" in support of this contention. (Pl.'s Mot. at 27.) The report does reflect "increased latency" and "decreased velocity," in addition to "normal amplitude" in her right median anti-sensory nerve. (Tr. 566.) But Plaintiff fails to cite to any diagnosis of carpal tunnel syndrome; nor does she explain how these findings are medically significant or "abnormal," as she contends. (Pl.'s Mot. at 27.) Indeed,

---

[2] The regulation cited by the ALJ at 20 C.F.R. §§ 404.1508 and 416.908 was replaced by the regulation cited herein at 20 C.F.R. § 404.1521 and made effective March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 FR 62560-01, 2016 WL 4702272 (Sept. 9, 2016). The difference between the new and old regulations does not affect the Court's analysis as to Plaintiff's claims.

the same report reflected that nerve conduction studies of all other nerves "were unremarkable," and ultimately concluded that "[t]here is no electrophysiologic evidence of radiculopathy, myopathy or distal compressive neuropathy," a finding relied upon by the ALJ. (Tr. 566.) Plaintiff fails to cite to any contrary interpretation of the electrodiagnostic report as would support a carpel tunnel syndrome diagnosis. *See Gaathje v. Colvin*, No. 3:15-cv-01049, 2016 WL 11262524, at *13 (D. Conn. July 11, 2016), *report and recommendation adopted*, 2017 WL 658055 (D. Conn. Feb. 17, 2017) (rejecting the plaintiff's characterization of a diagnostic imaging report where the report yielded "normal" "findings/impression" and where the plaintiff's interpretation relied on record citations merely reflecting her own self-reports of pain). Nor does she cite to any other "objective medical evidence" in the record to support her contention that carpal tunnel syndrome was medically determinable. The Court thus finds that the ALJ's findings are supported by substantial evidence and are consistent with either iteration of the applicable regulations. *See* 20 C.F.R. § 404.1508 (effective to Mar. 26, 2017) ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms"), *amended by* 20 C.F.R. § 404.1521 (effective Mar. 27, 2017) ("[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source," not "your statement of symptoms, a diagnosis, or a medical opinion").

### *Sciatica*

Plaintiff next asserts that she has sciatica and that her condition was medically determinable. On this issue, the evidence was, arguably, conflicting. The ALJ noted that Plaintiff went to the emergency room on three occasions during 2012 for this condition and that physical therapy notes from October 2012 indicated that she attended four treatment sessions with minimal relief, but that she did not attend some appointments and was ultimately discharged with an

7

assessment of "no progress." (Tr. 79.) The ALJ further observed that Plaintiff sought treatment again in December 2012 and was deemed "neurologically intact except for a slightly diminished right lower extremity." (*Id*.) Three years later, in July 2015, Plaintiff underwent a magnetic resonance imaging ("MRI") of her lumbar spine, which produced a normal result. (*Id.*) Indeed, on July 24, 2015, Dr. Gina Kang confirmed that the MRI of Plaintiff's back revealed "[n]o acute abnormalities," (Tr. 834), which is an assessment with which Plaintiff's internist, Dr. Kirsten Hohmann, concurred. (*See* Tr. 835.) Similarly, notes from Dr. Maria Maldonado, who discussed Plaintiff's care with Dr. Kang during Plaintiff's visit on June 6, 2016, reflect that Plaintiff has chronic back pain which is consistent with sciatica "but MRI in 2015 was completely normal." (Tr. 759.) In September and December 2016, Dr. Kang noted that Plaintiff occasionally used a cane but reiterated that the MRI of the back "revealed no acute abnormalities." (Tr. 729–30, 743–44.) According to Dr. Kang, Plaintiff was managing her pain with medication and was not interested in physical therapy. (Tr. 725.) Concluding that Plaintiff's "essentially benign physical examination findings are inconsistent and do not corroborate the claimant's symptoms and alleged functional limitations," the ALJ found "that this impairment is non-medically determinable." (Tr. 79.)

On this issue, Plaintiff cites numerous instances where she visited the emergency room or attended follow-up appointments with her physicians based upon her complaints of sciatica, and where she was prescribed pain medication for the condition. While these medical records do include a sciatica "assessment" (*e.g.*, Tr. 580, 757, 795, 862, 868) or diagnosis (*e.g.*, Tr. 754, 764–65), they appear to reflect only Plaintiff's description of her pain or self-diagnosis of her condition. The only alleged objective evidence relied upon is a single positive straight leg raising test ("SLR") noted by Dr. Kirsten Hohmann on Plaintiff's disability application dated June 29, 2015. (Pl.'s

8

Mot. at 28, citing Tr. 572.) But Dr. Hohmann also indicated that no prior supportive tests had been completed and with respect to the "Clinical Information" called for on the form, she wrote "N[ot]/A[pplicable] – currently under evaluation." (Tr. 572; *see also* Tr. 570.) Plaintiff does not cite to any other objective assessments interpreting the SLR, and a June 2015 report from Dr. Kang in connection with Plaintiff's follow-up exam for the purpose of filling out her disability application indicates, to the contrary, "Straight leg test negative." (Tr. 580.) As noted above, the ALJ also relied upon Plaintiff's normal MRI results. (*See, e.g.*, Tr. 587, 729, 834–35.) The Court therefore concludes that the ALJ's determination that sciatica was not medically determinable is supported by substantial evidence in the record.

Plaintiff alternatively argues that the ALJ failed to develop the record adequately on this issue and accordingly seeks a remand for that purpose. "[T]he ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quotation marks and citation omitted). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quotation marks omitted).

Specifically, Plaintiff notes that while her claim was pending on reconsideration, the Commissioner requested records from the Tully Health Center on August 18 and September 1, 2015, the inference being that the records were not obtained and reviewed before the ALJ rendered her decision. (Pl.'s Mot. at 28, citing Tr. 168.) As the Commissioner has clarified however, the Tully Health Center is part of Stamford Hospital,[3] and Plaintiff's records from Stamford Hospital

---

[3] *See Stamford Health Tully Health Center*, https://www.stamfordhealth.org/locations/locations-profile/tully-health-center/ (last visited Nov. 12, 2019); Fed. R. Evid. 201(b).

9

were included in the record before the ALJ. (*See* Tr. 92–93.) These records include those from "Tully Health Center GI" (Tr. 618–20) and are dated as late as October 2016, well after the requests were made in 2015. Thus, it appears the records were received.

But even if, as a factual matter, they were not, it is not clear what additional evidence Plaintiff believes the missing records might include and how this unnamed evidence would have altered the assessment regarding the medical determinability of her purported sciatica. As held above, the ALJ's determination is supported by substantial evidence and Plaintiff has not identified any gaps in the record or ambiguities which would have required the ALJ to further develop the record. *Cf. Burgos v. Berryhill*, No. 3:16-cv-1764 (AWT), 2018 WL 1182175, at *3 (D. Conn. Mar. 7, 2018) (remanding case to the Commissioner where "the ALJ either overlooked or ignored the evidence in the record that the plaintiff's back condition had been visualized by diagnostic imaging" and where her claims were supported by other record evidence that the ALJ failed to discuss or even to identify).

**Whether the ALJ Properly Applied the "Treating Physician Rule"**

The applicable version of the regulation from which the so-called "treating physician rule" derives required the ALJ to confer "controlling weight" on medical opinions from Plaintiff's "treating sources," so long as those opinions "on the issue(s) of the nature and severity of [Plaintiff's] impairment(s) [are] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "Treating source" is defined as an "acceptable medical source" who has provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship . . . ." *Id.* § 404.1527(a)(2). *See also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*) ("The treating physician rule generally requires

deference to the medical opinion of a claimant's treating physician," except where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.") (citation omitted).

### *Dr. A'Bodjedi*

Plaintiff first disagrees with the ALJ's determination that Plaintiff's major depressive disorder does not meet or equal the criteria in Listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1, which encompasses depressive, bipolar, and related disorders. (*See* Tr. 79.) In reaching this conclusion, the ALJ gave less weight to the opinion of Plaintiff's psychologist, Dr. Enenge A'Bodjedi.

To satisfy this listing criteria, "the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning which are: [1] understanding, remembering, or applying information; [2] interacting with others; [3] concentrating, persisting or maintaining pace; or [4] adapting and managing themselves." (Tr. 79.) Upon review of the entire record, the ALJ concluded that Plaintiff's limitations in these categories were either mild and/or moderate, not marked or extreme. (Tr. 79–80.) On June 9, 2015, Dr. A'Bodjedi completed a medical source statement in connection with Plaintiff's disability application and therein checked boxes corresponding to "marked" limitations in Plaintiff's ability to: (1) "Understand and remember detailed instructions;" (2) "Maintain attention and concentration for extended periods; (3) "Perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances;" and (4) "Complete a normal workday/workweek without interruptions from psychologically based symptoms" as well as "Perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 557.) Dr. A'Bodjedi further indicated that Plaintiff's mental health issues impact her ability to work, citing "depressed mood, high anxiety,

poor memory and concentration, hopeless and helpless" as symptoms of a chronic and recurring illness. (Tr. 556.) At the time he completed the report, Dr. A'Bodjedi had only been treating Plaintiff since April 20, 2015—*i.e.*, about seven weeks. (*See* Tr. 559, 853.)

The ALJ conferred less weight on Dr. A'Bodjedi's opinion because his "treatment notes do not generally support this level of limitations except for around the date of the report." (Tr. 87.) Plaintiff argues that the ALJ violated the "treating physician rule" because Dr. A'Bodjedi's opinion is consistent with her other medical records and corroborates her low level of mental functioning.

Assuming without finding that Dr. A'Bodjedi is Plaintiff's "treating physician" within the meaning of the regulations,[4] the Court can discern no legal error in the ALJ's failure to assign controlling weight to Dr. A'Bodjedi's conclusory determinations. *See, e.g.*, *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 648 n.13 (S.D.N.Y. 2019) ("It is well established that a treating physician's conclusory statements that a claimant is disabled or unable to work are not entitled to any special significance in the ALJ's determination") (quotation marks and citation omitted). Plaintiff fails to identify any "medically acceptable clinical and laboratory diagnostic techniques" to support Dr. A'Bodjedi's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 77–78 (2d Cir. 2018) (summary order) (rejecting claimant's argument that "ALJ improperly gave no weight to a statement by his treating physician" where the "statement was not accompanied by clinical findings designed to support his conclusory description."). Instead, Plaintiff identifies other treatment notes from Dr. A'Bodjedi in which he reports, at various times, Plaintiff's anxiety, depression, listlessness, worry, restlessness, loneliness, helplessness, nervousness, loss of pleasure, and intermittent inability to cope with daily

---

[4] The Commissioner argues to the contrary in light of the very brief period of time that Dr. A'Bodjedi had been treating Plaintiff before rendering his opinion. (Def.'s Mot. at 12 n.6.)

activities. (Pl.'s Mot. at 31–32.) These truncated reports of Plaintiff's symptoms, however, do not explain the bases for Dr. A'Bodjedi's opinion or the significant limitations placed on the Plaintiff therein. *See Gaathje*, 2016 WL 11262524, at *11 ("[A]n ALJ may properly discount a treating source's medical opinion where it is based on reports of plaintiff's subjective complaints.").

To the contrary, the ALJ relied upon Dr. A'Bodjedi's "[o]ther treatment notes" which reflected "generally mild findings." (Tr. 87.) In reviewing the record, the Court agrees that Dr. A'Bodjedi's treatment notes reflect far fewer limitations than those identified in the source statement. By way of example only, on June 9, 2015, the date of the statement, although Plaintiff reported feeling restless and nervous and Dr. A'Bodjedi noted anxiety, the notes also reflect "No sleep complaints ◦ Normal enjoyment of activities ◦ No decreased functioning ability ◦ No inability to cope with daily activities ◦ Not listless . . . No emotional problems/concerns . . . Being well organized and goal directed . . . Pt seen today with her sister, casually dressed in clean clothes. Her speech is fast with some flight of ideas. Pt. adheres to meds w/out side effects. Some poor memory and concentration . . . ." (Tr. 840.) One month after Dr. A'Bodjedi gave his opinion statement, Plaintiff's treatment notes for July 7, 2015 indicate "Pt doing well after increase of Atarax" and similarly reflect "No sleep complaints ◦ Normal enjoyment of activities ◦ No decreased functioning ability ◦ No inability to cope with daily activities ◦ Not listless . . . No emotional problems/concerns . . . Being well organized and goal-directed . . . ." (Tr. 837.) On July 29, August 10, and August 24, 2015, Dr. A'Bodjedi's notes from Plaintiff's visits observe Plaintiff's anxiety, nervousness, and sadness about her sister's terminal illness but simultaneously reflect "No decreased functioning ability ◦ No inability to cope with daily activities . . . No emotional problems/concerns . . . Being well organized and goal-directed . . . ." (Tr. 824–26.) Given these and other similar treatment records, no violation of the treating physician rule occurred

because the ALJ, in affording lesser weight to Dr. A'Bodjedi's opinion, determined that the opinion was not otherwise supported by the objective findings in the record and was inconsistent with the treating physician's own treatment notes.

### *Dr. Hohmann*

In a medical source statement dated June 29, 2015, Dr. Hohmann, Plaintiff's internist, checked a box indicating that "the patient [has] a significant medical condition that prevents him or her from working" consisting of "chronic lower back pain." (Tr. 570.) Dr. Hohmann also checked a box indicating that the condition was expected to last "[m]ore than two months but less than 6 months," to which she appended a handwritten note stating, "pending evaluation." (*Id*.) On the next page of the application Dr. Hohmann checked similar boxes and provided a handwritten explanation in which she sated that "Patient has chronic low back pain with radicular sx that limits her ability to lift/bend/carry >5 lbs or to stand/walk for prolonged periods. This is currently being evaluated." (Tr. 571.) On the following page Dr. Hohmann noted the positive "SLR" as an objective finding in support of Plaintiff's chronic lower back pain but, as noted above, she indicated that supportive test results had not been previously undertaken and were currently pending. (Tr. 572.) Dr. Hohmann also checked a number of boxes on Plaintiff's disability application indicating that: in an eight-hour workday with normal breaks, Plaintiff can sit for four hours and stand and walk for one hour; Plaintiff can frequently lift or carry up to five pounds but can never lift or carry more than five pounds; Plaintiff can generally use her hands and feet repetitively; Plaintiff can never bend, squat, crawl, and climb, though she can occasionally reach; Plaintiff cannot perform activities that require involvement in or exposure to unprotected heights, marked temperature and humidity changes, driving automotive equipment, or dust and fumes, though she can occasionally be around moving machinery; and Plaintiff has a mental health or

14

substance abuse issue that affects her ability to work consisting of "depressed mood, high anxiety, poor memory and concentration, hopeless and helpless."[5] (Tr. 572–74.)

The ALJ conferred "little weight to this opinion as it is unsupported by any back diagnosis and only limited treatment for this pain." (Tr. 87.) Plaintiff argues that the ALJ erred in failing to apply the treating physician rule to Dr. Hohmann's opinion. To the extent she challenges the ALJ's failure to apply the treating physician rule at Step Two in assessing whether Plaintiff's sciatica was a medically determinable impairment, as with Dr. A'Bodjedi, she fails to identify any clinical findings to corroborate Dr. Hohmann's conclusory remarks and thus to establish that those remarks are entitled to deference. Moreover, as already discussed and decided above, the ALJ's findings as to Plaintiff's sciatica were supported by substantial evidence in the record (*e.g.*, Tr. 587, 729), including Dr. Hohmann's own acknowledgment of Plaintiff's normal MRI. (Tr. 835.) Plaintiff's citations to records documenting her reports of pain, the pain medications she received for her sciatica, and her unsuccessful efforts at physical therapy (Pl.'s Mot. at 33–34) are insufficient to undermine the objective evidence relied upon by the ALJ, even allowing that Dr. Hohmann is Plaintiff's treating physician.[6]

To the extent Plaintiff challenges the ALJ's failure to defer to Dr. Hohmann in the context of assessing her RFC, the ALJ was not obligated to consider limitations arising from her back pain once the ALJ concluded that Plaintiff's back pain or sciatica were not medically determinable

---

[5] Curiously, this description mirrors verbatim the description of Plaintiff's symptoms relayed by Dr. A'Bodjedi in Plaintiff's disability paperwork. (*Compare* Tr. 556 *with* Tr. 574.) And the handwriting on both forms appears to be that of Dr. A'Bodjedi. (*Compare* Tr. 556 and 574 *with* Tr. 96.) While the ALJ should have perhaps clarified who completed this paperwork, *see Prince v. Berryhill*, 304 F. Supp. 3d 281, 288–89 (D. Conn. 2018), such clarification is not always necessary where, for instance, the ALJ was still able to "reach an informed decision based on the record," *see id.* at 289.

[6] The ALJ was also entitled to afford less weight to Dr. Hohmann because she is an internist and therefore not a specialist in back pain. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

15

impairments. *See* 20 C.F.R. § 404.1545(a)(2) (in assessing RFC, the Commissioner "will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe'"); *accord Wharton v. Berryhill*, No. 17-cv-1247 (LTS) (BCM), 2018 WL 5619961, at *16 (S.D.N.Y. Aug. 14, 2018), *report and recommendation adopted*, 2019 WL 1410745 (S.D.N.Y. Mar. 28, 2019) ("In assessing an RFC, the 'adjudicator must consider only limitations and restrictions attributable to medically determinable impairments.'") (quoting *Gaathje*, 2016 WL 11262524, at *14).

In addition, the purported limitations are inconsistent with multiple entries in Plaintiff's medical records. Again, by way of example only, on October 6, 2016, pre-colonoscopy notes reflect that Plaintiff reported "No back pain" and that she is "Able to do usual activities." (Tr. 613). On October 26, 2015, Plaintiff reported that she "does exercises for her back at home." (Tr. 818.) On May 4, 2016, Plaintiff reported that she "uses walking and exercise to cope with her" nicotine cravings. (Tr. 771.) On June 6, 2016 Plaintiff reported that "[s]he does walk a lot and does exercises on her own at home" to help her pain. (Tr. 753). On December 5, 2016, Plaintiff reiterated that "[s]he does walk a lot and does exercises at home when needed." (Tr. 725.) And as noted by the ALJ, Plaintiff's purported lower back pain is not diagnosed as resulting from any identified medical condition and her MRI results were completely normal. (Tr. 587.)

The ALJ therefore did not violate the treating physician rule by affording lesser weight to Dr. Hohmann's opinion regarding Plaintiff's exertional limitations.

**Plaintiff's RFC**

Plaintiff's challenge to the RFC derives from the arguments discussed above regarding her sciatica and her carpal tunnel syndrome. For example, Plaintiff cites to Dr. Hohmann's conclusions regarding Plaintiff's physical limitations arising from her lower back pain and argues

that the ALJ erred in failing to place exertional limitations upon her as part of the RFC. (Pl.'s Mot. at 35.) She also repeats her contention that her carpal tunnel syndrome is a medically determinable impairment and argues that the ALJ erred in failing to consider this impairment in formulating her RFC as well. (*Id.* at 36.) Plaintiff relies upon a series of cases which hold that an ALJ must consider the "combination" of Plaintiff's impairments in determining whether she is disabled. The Court takes no issue with this well-settled proposition. But as discussed above, the ALJ properly confined her consideration to symptoms arising *only* from Plaintiff's medically determinable impairments. *Wharton*, 2018 WL 5619961, at *16; *see also Gaathje*, 2016 WL 11262524, at *13 ("Here, because the ALJ found that plaintiff's pain in large part was not the result of a medically determinable impairment, he was not required [to] make findings about whether such subjective symptoms affected plaintiff's ability to do basic work activities."); *Rivera v. Berryhill*, No. 16-cv-8580 (GBD) (SDA), 2018 WL 1167056, at *3 n.3 (S.D.N.Y. Feb. 16, 2018) ("[F]unctional limitations caused by non-medically determinable impairments cannot be considered in the five-step sequential analysis"). Thus, claims arising out of Plaintiff's purported sciatica or carpal tunnel syndrome are not a basis upon which to find error in the ALJ's determination of Plaintiff's RFC. In sum, the determination that Plaintiff's RFC did not include exertional limitations is supported by substantial evidence in the record.

Finally, Plaintiff argues that the ALJ should have included a "no public interaction" limitation in her RFC due to certain "triggers" that have manifested during therapy. (Pl.'s Mot. at 37.) She cites a report she made to her counselor describing an incident that occurred during group therapy in which a fellow participant was grunting while Plaintiff was talking, and another incident in which Plaintiff reported that she was crying and upset during group therapy and indicated that

she "felt like everyone in the group . . . was against me." (Tr. 938.) However, these same treatment notes reflect that the counselor complimented Plaintiff for how she handled the first situation and, when asked how she wanted to proceed, Plaintiff responded that she intended to return to group therapy. (*Id.*) As to the second incident, the treatment notes identified a solution by which Plaintiff would speak to the program director and indicated that "Client did identify that she was doing well and that she was not having problems at this time." (*Id.*) At her hearing Plaintiff also testified that she continues to attend group therapy every day. (Tr. 119.)

In assessing the effects of Plaintiff's symptoms on her RFC, the ALJ noted that Plaintiff "testified that she walks to appointments and stores, attends individual and group therapy, cared for her sister, attends church, and visits with friends," (Tr. 85) which are observations that are borne out by Plaintiff's testimony. The ALJ concluded that "these self-described activities indicate the claimant functions at a higher level physically, psychologically, and even cognitively than alleged." (*Id.*) In addition, Dr. A'Bodjedi's opinion reflects that Plaintiff was "Not Significantly Limited" (*i.e.*, can consistently and usefully perform) in her ability to: "Work in coordination with or proximity to others without being distracted by them;" "Interact appropriately with the general public;" "Accept instructions and respond appropriately to criticism from supervisors;" "Get along with co-workers or peers without distracting them or exhibiting behavior extremes;" and "Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness." (Tr. 557–58.) Accordingly, the two isolated events relied upon by Plaintiff do not undermine the ALJ's determination on these issues. And significantly, the ALJ did recognize limitations resulting from her mental impairments insofar as the RFC provides that Plaintiff is limited to "occasional

18

interaction with coworkers, supervisors, and general public." (Tr. 81.) In sum, the ALJ's determination in this regard is supported by substantial evidence in the record.

**Conclusion**

For the foregoing reasons, Plaintiff's Motion to Reverse or, in the alternative, to Remand is DENIED and the Commissioner's Motion to Affirm is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 14th day of November 2019.

                                           */s/ Kari A. Dooley*
                                           KARI A. DOOLEY
                                           UNITED STATES DISTRICT JUDGE